# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARIA LAURINO and RICARDO MILLER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE VALLEY HOSPITAL, BOARD OF TRUSTEES OF THE VALLEY HOSPITAL, AND THE VALLEY HOSPITAL PLAN COMMITTEE,<br><br>Defendants. | **Case No. 2:25-cv-15263** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Maria Laurino and Ricardo Miller ("Plaintiffs"), individually and as representatives of a class of similarly situated participants and beneficiaries of the 401(k) Retirement Savings Plan for Employees of The Valley Hospital (the "Plan"), bring this action for breach of fiduciary duties in the management, operation, and administration of the Plan under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") against the Plan Sponsor, The Valley Hospital ("Valley Hospital"), the Board of Trustees of The Valley Hospital ("Board"), and The Valley Hospital Plan Committee ("Committee") (collectively, "Defendants").

1

## **INTRODUCTION**

1.      This action is brought by and on behalf of current and former participants in an ERISA defined contribution retirement plan sponsored by Valley Hospital to recover losses due to mismanagement of Valley Hospital's 401(k) retirement plan, including the selection and retention of imprudent investment options and engaging in prohibited transactions with a party in interest.

2.      Defined contribution plans, such as 401(k) and 403(b) plans, have become America's primary retirement system. Unlike traditional defined-benefit pension plans, which provide guaranteed payouts for life and where the employer assumes the investment risks and pays the fees and expenses of the investments, 401(k) plan accounts rise and fall with financial markets. Employees bear the market risk of a 401(k) plan's investments and must pay the fees and expenses of the investment options and plan administrative services. Thus, the proliferation of 401(k) plans has exposed millions of American workers to the volatility and risk of the stock market as well as high fees charged by Wall Street money managers. These retirement plans are significant to the welfare of the participants and beneficiaries in these plans.

3.      The marketplace for services for defined contribution plans is established and highly competitive. Large plans, like Valley Hospital's Plan, have the bargaining power to secure high-quality administrative and investment

management services at the lowest costs available to institutions. As ERISA fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries in ensuring that all Plan expenses and compensation paid to third-party service providers are reasonable. *See* 29 U.S.C. § 1104(a)(1).

4.      In this case, Defendants, as fiduciaries to the Plan, failed to properly discharge their duties of prudence and loyalty in several basic ways.

5.      *First*, Defendants wasted participants' money by failing to appropriately select and monitor the Plan's primary fixed income investment option, the Lincoln Stable Value Account ("Lincoln SVA"). During the Class Period,[1] approximately 14% and 25% of the Plan's total assets were invested in the Lincoln SVA, making it the largest single investment in the Plan. Lincoln National Life Insurance Company ("Lincoln National"), an affiliate the Plan's Trustee, Lincoln National Corporation d/b/a Lincoln Financial Group ("Lincoln Financial"), sold the Lincoln SVA, group annuity contract. All Plan assets invested in the Lincoln SVA were held in Lincoln's general account, which has allowed Lincoln to earn income

---

[1] Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ...." 29 U.S.C. § 1113; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six (6) years of suit, the claim is timely."). Here, the "Class Period" begins September 3, 2019 and continues through the date of judgment.

based on the spread between the amount of interest it earns on its general account and the lower rate of interest – the crediting rate – it pays to Plan participants.

6. The Defendants breached their fiduciary duties of prudence and loyalty by allowing Lincoln – a party in interest – to improperly benefit from its provision of services to the Plan by receiving unreasonable and excessive compensation for managing the Lincoln SVA. Substantially similar investment products were available to the Plan throughout the Class Period from other providers that would have provided the Plan's participants with equivalent or higher returns at a substantially lower cost and without improperly benefiting a party in interest.

7. *Second*, Defendants imprudently offered and maintained unreasonably expensive, underperforming funds that a prudent fiduciary should have monitored and replaced with comparable funds that offered higher returns at a lower cost.

8. Specifically, an ERISA fiduciary must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring all investment options offered by the plan.

9. Plaintiffs are not second-guessing Defendants' investment decisions with the benefit of hindsight. The information that Defendants needed to make informed and prudent investment decisions was readily available at the time those

4

decisions were made. Defendants either failed to do even minimal due diligence or, worse, simply ignored readily available information. As a result, Defendants, in dereliction of their fiduciary duties, stocked the Plan with overpriced and underperforming investments, needlessly wasting participants' money to their financial detriment.

10.    *Third*, Defendants failed to monitor all the sources of income that Lincoln Financial (together with its affiliates Lincoln National and Lincoln Retirement Services Company, LLC (the Plan's recordkeeper)) received for providing investment offerings and recordkeeping and administrative services to the Plan, and allowed Lincoln Financial, the Plan's Trustee, to receive excessive compensation for such services.

11.    Each dollar that Defendants wasted was one less dollar in participants' accounts, dollars that would have generated returns and built larger retirement savings. Those lost returns compound over time, so each wasted dollar matters greatly. The U.S. Department of Labor estimates that over thirty-five years, as little as a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[2]

---

[2] *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., "A Look at 410(k) Plan Fees," 1-2 (September 2019), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

5

12. Plaintiffs, individually and as representatives of the Class defined below as consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce the Defendants' liability under 29 U.S.C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. Plaintiffs also seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

13. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

14. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

15. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(l) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

16. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because it is the District in which the Plan was

6

administered, where at least one of the alleged breaches took place, and where at least one Defendant may be found.

## THE PLAN AND THE PARTIES

### A.   The Plan

17.   The Plan, established on March 28, 2004, is a 401(k) defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34), covering substantially all employees of The Valley Hospital and affiliated employers that have adopted the Plan and who have met the age and service requirements of the Plan. The Plan was established and maintained under a written document and was amended and restated effective April 15, 2022. Between 2018 and 2024, the Plan had between 6,269 and 8,700 participants, and $501,892,644 and $1,059,210,825 in assets.

18.   The Summary Plan Description dated April 15, 2022, provides that Valley Hospital employees are eligible to participate in the Plan "as of the first Entry Date based on when [the eligible employee] satisf[ies] the minimum age and service requirements." To make a salary deferral, the eligible employee must complete a Salary Deferral election requesting that a portion of their compensation be contributed to the Plan instead of being paid to them as wages. For eligible employees who have not made a Salary Deferral election, Valley Hospital

automatically withholds 4% of the eligible employee's Plan Compensation from each paycheck and deposits such amounts into the Plan as a Salary Deferral.

19.    Eligible Employees may receive employer contributions under the Plan after a Year of Service, defined as at least 100 hours of work during a 12-month period immediately following the date of hire. Summary Plan Description 2022, at 6.

20.    Eligible Employees include employees of the following employers: The Valley Hospital, Valley Medical Services, Inc., Valley Physician Services, Inc., Valley Physician Services, N.Y. P.C., Valley Health System, Valley Medical Services PC, and Valley Physician Services PC. *Id.* at 5.

21.    Non-Party Lincoln Retirement Services Company, LLC ("Lincoln Retirement") is the Plan's recordkeeper. As such, Lincoln Retirement provides certain administrative functions and services for the Plan.

22.    Non-Party Lincoln National Corporation d/b/a Lincoln Financial Group ("Lincoln Financial") is the Trustee of the Plan (acting through its subsidiary Lincoln Financial Group Trust Company). As Trustee of the Plan, Lincoln is responsible for the custody of the Plan's assets and for the payment of benefits to eligible participants. In this regard, the Summary Plan Description provides: "All amounts contributed to the Plan are held by the Plan Trustee in a qualified Trust. The Trustee is responsible for the safekeeping of the trust funds and must fulfill all Trustee duties

in a prudent manner and in the best interest of you and your beneficiaries. The Employer has designated a separate Trustee to hold the assets under the Plan. The trust established on behalf of the Plan will be the funding medium used for the accumulated of assets from which Plan benefits will be distributed."

23.    Non-Party Lincoln National Life Insurance Company ("Lincoln National"), an affiliate of Lincoln, has offered and managed the Lincoln SVA to the Plan's participants through its Group Annuity Contracts with the Plan.

24.    Lincoln Retirement, Lincoln Financial, and Lincoln National are collectively referred to as "Lincoln."

**B.    Plaintiffs**

25.    Plaintiff Maria Laurino resides in Lewes, Delaware, and during the Class Period was a participant in the Plan under § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan. Plaintiff Laurino suffered economic losses as a direct result of the conduct complained of herein. Throughout her participation in the Plan, Plaintiff Laurino paid the recordkeeping and administrative costs associated with the Plan complained of herein. In addition, Plaintiff Laurino invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- Lincoln SVA
- American Funds EuroPacific Growth Fund
- American Funds Washington Mutual Investors Fund

- JPMorgan Large Cap Growth Fund
- Vanguard 500 Index Fund
- Vanguard Mid-Cap Index Fund
- Vanguard Small-Cap Index Fund
- TIAA-CREF Real Estate Securities Fund
- American Funds New World Fund

26.    Plaintiff Ricardo Miller resides in Woodland Park, New Jersey, and during the Class Period was a participant in the Plan under § 1002(7) because he and his beneficiaries were eligible to receive benefits under the Plan. Plaintiff Miller suffered economic losses as a direct result of the conduct complained of herein. Throughout his participation in the Plan, Plaintiff Miller paid the recordkeeping and administrative costs associated with the Plan complained of herein. In addition, Plaintiff Miller invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- American Century Emerging Markets Fund
- American Funds Europacific Growth Fund
- American Funds Europacific Growth Fund
- American Funds Washington Mutual Investors Fund
- JPMorgan Large Cap Growth Fund
- Lincoln SVA
- Metropolitan West Total Return Bond Fund
- Metropolitan West Total Return Bond Fund
- TIAA Kaspick Real Estate Securities Fund
- Vanguard 500 Index Fund
- Vanguard Mid-Cap Index Fund
- Vanguard Small-Cap Index Fund
- Vanguard Wellington Fund
- YourPath iShares Target Date 2060 Moderate Allocation Fund

10

27.    Plaintiffs Laurino and Miller each have both statutory and constitutional standing. First, 29 U.S.C. § 1132 (a)(l)-(3) confers standing on a plan "participant" to bring claims for ERISA violations, including claims under 29 U.S.C. § 1109 (a) for breach of fiduciary duty. Claims pursuant to 29 U.S.C. § 1109(a) are brought in a representative capacity on behalf of the Plan. Each Plaintiff was, during the Class Period, a "participant" in the Plan as that term is defined in 29 U.S.C. § 1002(7). Each Plaintiff thus has statutory standing.

28.    As to constitutional standing (also referred to as Article III standing), each Plaintiff personally suffered concrete and particularized economic injuries. During the Class Period, each Plaintiff was invested in the Lincoln SVA and was charged excessive investment and administrative fees to their respective individual accounts. These facts are sufficient to confer constitutional standing. Thus, Plaintiffs have standing to bring their claims individually and in a representative capacity on behalf of the Plan and the participants in the Plan.

C.    **Defendants**

29.    Defendant The Valley Hospital ("Valley Hospital") is an acute-care, not-for-profit hospital that maintains its corporate office and principal place of business at 223 North Van Dien Avenue, Ridgewood, NJ 07450-2736. In addition to Valley Hospital, the Plan is maintained for the following participating employers:

- Valley Medical Services, Inc.
- Valley Physician Services, Inc.

- Valley Physician Services, N.Y. P.C.
- Valley Health System
- Valley Medical Services PC
- Valley Physician Services PC

30.    Defendant Valley Hospital is the Plan Sponsor and Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i), and it is a named fiduciary under the Plan and 29 U.S.C. § 1102(a). *See* Plan Document (2020) ¶ 11.03. According to the Plan documents, the Plan Administrator maintains the Plan records, provides forms for requesting a distribution from the Plan, and directs payment of vested benefits. The Plan Administrator or its delegate has full discretionary authority to interpret the Plan. The Plan Administrator also has the authority to direct another person to carry on the day-to-day operations of the Plan. *Id.* at ¶ 11.04(b)(1)-(11). As both the Plan Sponsor and Administrator, Defendant Valley Hospital has a fiduciary responsibility to select and monitor the Plan's investment options and service providers, and to control the Plan's administrative expenses.

31.    Defendant Board of Trustees of The Valley Hospital and each of its members (referred to as John Does 1-10) was at all relevant times a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets. Under ERISA,

12

fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.    On information and belief, the Board of Trustees of The Valley Hospital has delegated certain administrative and investment-related duties to Defendant Valley Hospital Plan Committee ("Committee") and/or other committees, and their members are named fiduciaries of the Plan (defined above as "Committee").

33.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

34.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20) are collectively referred to herein as the "Committee Defendants."

35.    Defendants, and each of their respective members during the Class Period, were and/or are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they had and have the sole authority to amend or terminate, in whole or part, the Plan or the trusts, and have discretionary authority to control the operation, management, and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to

13

participants for the investment of their contributions and provision of their retirement income.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

36. Valley Hospital is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i), the Plan Sponsor under 29 U.S.C. § 1002 (16)(B), and a "named fiduciary" under the Plan instrument and 29 U.S.C. § 1002(a). As such, Valley Hospital has fiduciary responsibility for the Plan's investments and administrative expenses.

37. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Moitoso v. FMR LLC,* 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)).

38. ERISA's statutory standard of care encompasses the traditional fiduciary duties of prudence and loyalty. *See Ellis v. Fid. Mgmt. Tr. Co.,* 257 F. Supp. 3d 117, 126 (D. Mass. 2017), *aff'd*, 883 F.3d 1 (1st Cir. 2018). Under ERISA, a plan fiduciary must:

> discharge his duties … *solely* in the interest of the participants and beneficiaries and

14

(A)    for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ....

29 U.S.C. § 1104 (emphasis added).

39.    29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge their duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l.*, 135 S. Ct. 1823, 1829 (2015).

40.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Lincoln Retirement, Lincoln Financial, Lincoln National are "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

41.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

15

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

42.     Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## FACTUAL ALLEGATIONS

43.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained

16

through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34). Participants' investments are held in trust. Typically, participants direct the investment of their accounts, choosing from the lineup of available plan investment options chosen by the plan sponsor.

**A.   Defendants Imprudently Maintained the Plan's Investment in the Lincoln SVA, When Other Firms Offered Superior Alternatives**

44.   For defined contribution retirement benefit plans, stable value investments are intended to provide participants with an option that protects their principal and is shielded from risks of loss. Throughout the Class Period, the Plan's stable value investment has been the Lincoln SVA.

45.   Prior to 2022, the Plan used model portfolios comprised by an allocation of the Plan's investment options, which was designated as the Plan's Qualified Default Investment Alternative ("QDIA"). While Plan participants may select any investment option offered by the Plan, in the absence of an investment election, participant contributions are automatically invested in the Plan's QDIA. Each of these model portfolio included allocations to the Lincoln SVA, which ensured that a substantial portion of Plan assets would be invested in the Lincoln SVA.

46.   In 2022, the Plan switched to a new QDIA – the YourPath iShares model portfolios, which are unitized model portfolio investment options that contain a mix of iShares stock, bond index funds, and the Lincoln SVA. Defendants have

designated the YourPath iShares model portfolios as the Plan's QDIA. *See Qualified Default Investment Alternative (QDIA) Employee Notice*. This ensures that a substantial portion of the Plan's assets will be invested in the YourPath iShares portfolios, all of which include an allocation in the Lincoln SVA.

47.    The allocation of assets in each YourPath iShares model portfolio is based on a participant's expected retirement date (represented in 5-year increments from 2010 to 2065), and their level of risk tolerance, ranging from the lowest risk "Conservative Portfolio" to the medium risk "Moderate Portfolio," and the highest level of risk "Aggressive Portfolio." A recent Participant Fee Disclosure describes the YourPath iShares portfolios as follows:

> Certain asset allocation portfolios are presented as a single, unitized investment option. Each portfolio consists primarily of a mix of stock and bond-based funds. Unitized Portfolios are not a separate security or investment. Rather, customers who invest through a unitized portfolio own shares in the underlying funds within the portfolios….

48.    Each of the YourPath iShares model portfolios includes an allocation of the participant's investments to the Lincoln SVA, which guarantees a high percentage of the Plan's assets will continue to be invested in Lincoln's most profitable offering in the Plan.

49.    The selection of the Lincoln SVA and YourPath iShares model portfolios exposed Plan participants to single-entity credit risk, subjected them to

18

excessive, hidden fees, and resulted in millions of dollars in foregone returns compared to readily available alternatives.

**The Unduly Risk and Structure of the Lincoln SVA**

50.    Stable value funds are not SEC-registered mutual funds. Rather, they are single-company fixed annuity contracts structured as either an insurance company general account product (as is the case here) or an insurance company separate account and are solely regulated by the State Insurance Commissioner selected by the insurance company (Lincoln National). There are alternative structures, including synthetic stable value funds, which are run by a Registered Investment Advisor ("RIA") regulated by the SEC.

51.    The differences between the different types of funds – and the risks inherent in such structures – are critical from a fiduciary standpoint. The Lincoln SVA is an insurance company general account product.

52.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides returns over time that are (or at least should be) consistently higher than money market funds. Stable value accounts differ from both bond funds and money market funds, however, in that they seek to generate returns greater than money market funds and equivalent to short- to intermediate-term bond funds. Stable value funds can do this because participant behavior is such that the amount of

19

money invested in the account is relatively stable over time. This enables stable value account providers to offer higher crediting rates (the rate of return to the plan participants) and to guarantee participants will not lose money by ensuring the fund transacts at book value.

53.    Single fixed annuity contracts are set by the insurance company at its discretion, which typically maximizes profit for the insurance company and minimizes returns to participants, constituting a fiduciary breach.

54.    There are several types of stable value accounts in the 401(k) marketplace. For instance, large plans often offer "synthetic" stable value funds, which are the least risky, because the principal is guaranteed by multiple "wrap providers,"[3] and the fund owns the assets of the underlying funds. General account products (like the Lincoln SVA at issue here), where the funds are held unrestricted in the insurance carrier's general account, are the riskiest type of stable value funds and consequently should offer the highest rates.

55.    For a general account fund, the insurer's payment obligations are backed by the insurer's unrestricted general accounts. Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted

---

[3] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relies on both the value of the associated assets and the financial backing of the wrap issuer.

20

against the insurer. Thus, such funds are subject to single-entity credit and liquidity risk, meaning the insurer is the sole entity responsible for paying such funds; if the insurer fails, no other entity will satisfy the loss.[4]

56.    Historically, general account fixed annuities had set rates and maturities typically 3 to 5 years. However, most current general account fixed annuity contracts, including the Lincoln SVA, are in a riskier form, which is called an Immediate Participation Guarantee ("IPG"). IPG group annuities have no maturity giving them significantly higher duration risk, credit and liquidity risk, and set whatever rate they want without a set formula.

57.    There is a slightly less risky version of a general account known as a separate account. A separate account has the single entity credit risk of a general account, as the plan does not own the securities like synthetic stable value funds, but in the case of default, it has a higher level of collateral held in the separate account, which should allow a larger recovery in the case of the default of the insurer. Through book value accounting, all stable value products, including synthetics, provide protection of principal or a 0% floor. Many general account fixed annuities, including the Lincoln SVA, provide an almost meaningless 1% floor in an attempt

---

[4] Courts have recognized the heightened risk of general account stable value funds, stating, "[T]he Plan does not own the assets of the fund, which are placed in the insurance company's general account. Thus, should Principal become insolvent, the Plan could only recover to the extent assets from Principal's general accounts are available—i.e., as an unsecured creditor.… The 1980s and 1990s saw several high-profile insolvencies of stable value providers." *Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-CV-00048-GNS, 2019 WL 3536038, at *6 (W.D. Ky. Aug. 2, 2019).

21

to justify excessive spread fees. Even in the lowest rate environments in the past 30 years, this feature has had no value to participants or plans.

58.    Synthetic stable value funds eliminate the single entity credit risk. "A synthetic stable value fund is a diversified portfolio of fixed income securities and is insulated from interest rate volatilities through wrap contracts with insurers… Unlike general account and separate account products, however, with a synthetic stable value product, the plan participants actually own the underlying assets." *Disselkamp*, 2019 WL 3536038, at *6. For this reason, many plans that are similar in size to Valley Hospital's Plan use a lower-risk synthetic stable value product rather than general account products.

### Excessive Compensation

59.    The Lincoln SVA is a general account product established pursuant to a contract between Valley Hospital and Lincoln National. The investment funds are deposited and held in Lincoln's general account, which enables Lincoln Financial and/or Lincoln National to earn a non-transparent "spread" income. This spread represents the difference between the crediting rate that it pays to Plan participants and the returns that are earned by Lincoln Financial and/or Lincoln National by investing their general account funds. The spread income constitutes self-dealing and unreasonable compensation.

60.    Lincoln Financial and/or Lincoln National receive revenue based on a percentage of the assets in the Lincoln SVA annually, and as of December 31, 2024, $176,568,451 in Plan assets were invested in the Lincoln SVA.

61.    Collectively, Lincoln received excessive compensation for providing services to the Plan from spread income on all assets held in the Lincoln SVA. The precise amount of spread income Lincoln Financial and/or Lincoln National received from Plan assets invested in the Lincoln SVA can only be known through the formal discovery process. However, based on the substantially lower crediting rates provided by the Lincoln SVA, as compared to similar fixed annuity products offered to defined contribution retirement plans, Plaintiffs estimate that Lincoln has obtained at least 1% of assets in spread income and likely more than 2% of assets. **Table 1** below is based on the low-end estimate for Lincoln's spread income.

**Table 1**

| YEAR | PLAN ASSETS IN LINCOLN SVA | SPREAD INCOME FROM LINCOLN SVA |
|---|---|---|
| 2019 | $150,667,434 | $1,506,674.34 |
| 2020 | $200,136,288 | $2,001,362.88 |
| 2021 | $208,938,275 | $2,089,382.75 |
| 2022[5] | $174,309,703 | $1,743,097.03 |

---

[5] In 2022, the Plan designated the YourPath iShares model portfolio as its Qualified Default Investment Alternative ("QDIA"). Each of the YourPath portfolios invests a substantial portion of Plan assets in the Lincoln SVA. Changing the Plan's QDIA resulted in a substantial portion of Plan assets being redirected to the underlying Lincoln SVA. According to the Plan's Form 5500, $39,863,117 of Plan assets were directed in the Lincoln SVA through the YourPath portfolios and $134,446,586 of Plan assets were directly investment in the SVA.

23

| 2023[6] | $178,774,984 | $1,787,749.84 |
| 2024[7] | $176,568,451 | $1,765,684.51 |

62.    For just the years above, based on a conservative estimate of 1%, Lincoln's total spread income is estimated to be at least $10.8 million. This revenue represents non-transparent, excessive compensation taken at the expense of the Plan and its participants.

63.    Defendants breached their fiduciary duties of prudence and loyalty by engaging in an imprudent process that facilitated the selection and retention of the Lincoln SVA. This selection allowed Lincoln Financial and/or Lincoln National, as parties in interest, to unilaterally set the crediting rate and maximize their own profits while simultaneously guaranteeing minimized returns to Plan participants. This conduct resulted in Lincoln being paid unreasonable and excessive compensation derived from Plan assets, constituting a prohibited party-in-interest transaction.

64.    The Plan's Form 5500 filings confirm that the selection of the Lincoln SVA qualifies as a party-in-interest transaction because the SVA is managed by Lincoln National and Lincoln Financial is the Plan's Trustee. *See* 2024 5500 Filing, Notes to Financial Statements, p. 13.

---

[6] According to the Plan's Form 5500 for 2023, $46,872,563 of Plan assets were directed in the Lincoln SVA through the YourPath portfolios and $131,902,421 of Plan assets were directly invested in the Lincoln SVA.

[7] According to the Plan's Form 5500 for 2024, $53,418,460 of Plan assets were directed in the Lincoln SVA through the YourPath portfolios and $$123,149,991 of Plan assets were directly invested in the Lincoln SVA.

65.    Defendants breached their fiduciary duties by knowingly causing the Plan to engage in prohibited transactions with Lincoln as parties in interest by allowing the impermissible exchange of assets for unreasonably priced services. Defendants' failure to monitor this excessive spread income demonstrates an imprudent process.

**Failure to Exercise Fiduciary Leverage and Select a Prudent QDIA**

66.    The Lincoln SVA was and is subject to the single entity credit risk of Lincoln National, the issuer of the contract. The crediting rate, set in advance by Lincoln Financial and/or Lincoln National and reset from time to time in Lincoln Financial's and/or Lincoln National's sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the Lincoln SVA have an interest. Thus, Defendants would have had the opportunity and duty to evaluate the prudence of maintaining this investment offering in advance, and at least on an annual basis.

67.    Accordingly, this is not a case that involves the judging of the prudence of an investment with the benefit of hindsight. Indeed, the selection and retention of the Lincoln SVA (with its unduly single-entity risk and excessive fees) demonstrates the absence of a prudent process to evaluate the Plan's investment offerings.

68.    Defendants imprudently selected the Lincoln SVA as a key component of the YourPath iShares model portfolios that serve as the Plan's QDIA. Most large

25

401(k) plans use target retirement date mutual funds as the QDIA because such funds provide one-stop shopping for participants looking for a simple way to invest their retirement savings in a low-cost mutual fund or CIT that will have the optimal asset balance and returns to stay ahead of inflation.

69.    In a recent report to Congress by the U.S. General Accountability Office ("GAO"), it was noted that "Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants. TDFs allocate assets over time based on participants' targeted retirement dates."

70.    Prudent plan sponsors often "choose TDFs as their default investment because TDFs offer low fees, a well-diversified all-in-one portfolio, and a 'set it and forget it' option for participants." The number of 401(k) plan participants offered TDFs as an investment option increased from 42 percent in 2006 to 84 percent in 2020. "As of June 2023, defined contribution plans held approximately $2.8 trillion in TDF assets, according to the Investment Company Institute (ICI) and Morningstar." This is a substantial percentage of the $8 trillion that was invested in 401(k) plans at the end of 2021.

71.    To be sure, risk levels, performance, and fees vary across TDFs – *i.e.*, some are better than others. However, it was imprudent for Defendants to completely overlook the inclusion of a suite of TDFs as investment options for the Plan during

the Class Period. And it was an even more significant fiduciary lapse for the Defendants to fail to consider a TDF as the QDIA for the Plan.

72.    Rather than selecting a mutual fund or collective investment trust TDF, which would have allowed lower costs and a proven track record of performance, Defendants, presumably guided by Lincoln as parties in interest, selected the YourPath portfolios, which guaranteed that a high percentage of Plan assets would continue to be invested in the Lincoln SVA.

73.    As ERISA fiduciaries, Defendants had an obligation to monitor the fees, risks, and performance of the Lincoln SVA and to remove and/or replace it when similar stable value investment options could be obtained from numerous providers at a lower cost. *See*, *e.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected."); *Disselkamp*, 2019 WL 3536038, at *8 (denying motion to dismiss claims that the defendants imprudently selected a higher risk general account stable value fund as a result of an "alleged failure to employ a prudent methodology and comparisons with better performing SVAs…").

27

**Substandard Crediting Rates and Forgone Earnings**

74.     During the Class Period, the Plan received a lower crediting rate for the Lincoln SVA than other comparable plans received for general account and less risky separate account stable value funds. The Plan continued to hold the riskier Lincoln SVA even though it paid substantially lower crediting rates than safer separate account stable value options. A comparison of the rates for the Lincoln SVA to general account and separate account stable value options with higher crediting rates is set forth in **Table 2** below:

**Table 2**

| Time Period (Calendar Quarter) | Crediting Rates for Lincoln SVA in[8] the Plan (%) | Crediting Rates for MassMutual Separate Account Stable Value (%) | Crediting Rates for TIAA Traditional Annuity (%) General Account RC |
|---|---|---|---|
| 1Q 2019 | 1.7 | 4.66 | 4.0 |
| 2Q 2019 | 1.6 | 4.47 | 4.0 |
| 3Q 2019 | 1.6 | 4.41 | 4.0 |
| 4Q 2019 | 1.7 | 4.55 | 4.0 |
| 1Q 2020 | 1.3 | 4.03 | 3.80 |
| 2Q 2020 | 1.3 | 4.03 | 3.8 |
| 3Q 2020 | 1.3 | 4.03 | 3.8 |
| 4Q 2020 | 1.3 | 4.03 | 3.8 |
| 1Q 2021 | 1.3 | 4.03 | 3.8 |
| 2Q 2021 | 1.3 | 4.03 | 3.8 |
| 3Q 2021 | 1.3 | 4.03 | 3.8 |
| 4Q 2021 | 1.3 | 4.03 | 3.8 |
| 1Q 2022 | 1.4 | 4.03 | 3.95 |
| 2Q 2022 | 2.3 | 4.55 | 5.20 |
| 3Q 2022 | 2.2 | 4.47 | 5.20 |
| 4Q 2022 | 3.3 | 5.80 | 5.95 |

---

[8] The Lincoln SVA crediting rates are estimates based on extrapolations from Participant Fee Disclosures for the 2024 calendar year. Plaintiffs requested crediting rates from Defendants in their Section 104 request and a subsequent meeting with Valley Hospitals' Counsel. Plaintiffs further requested fee disclosures for prior years from Lincoln through a document request. Defendants and Lincoln refused to produce.

28

| 1Q 2023 | 3.4 | 5.70 | 6.25 |
|---|---|---|---|
| 2Q 2023 | 3.3 | 5.52 | 6.25 |
| 3Q 2023 | 3.4 | 5.34 | 6.75 |
| 4Q 2023 | 3.4 | 5.26 | 6.75 |
| 1Q 2024 | 2.75 | 4.98 | 5.75 |
| 2Q 2024 | 2.75 | 4.98 | 5.75 |
| 3Q 2024 | 2.03 | 4.94 | 5.5 |
| 4Q 2024 | 2.03 | 4.94 | 5.5 |
| 1Q 2025 | 2.03 | 5.3 | 5.5 |
| 2Q 2025 | 2.25 | 5.3 | 5.25 |

75.    The crediting rate in a stable value annuity, such as the Lincoln SVA, is the most crucial component of investment performance because it represents the minimum annual rate of return guaranteed to participants. It is the core mechanism by which a stable value fund provides capital preservation and stable growth.

76.    Because the guaranteed crediting rates operate as a performance floor, annuities that offer higher crediting rates inherently provide participants with a higher guaranteed minimum return and are thus better-performing investments for the purpose of capital preservation.

77.    As set forth in **Table 2**, the crediting rate of the Lincoln SVA was, upon information and belief, lower than the crediting rates offered by the comparable MassMutual Separate Account Stable Value and TIAA Traditional General Account Annuity.

78.    If Defendants secured a higher crediting rate for the Lincoln SVA, in line with the crediting rates used by MassMutual and TIAA, it would have earned greater returns for participants.

29

79.  For example, **Table 3,** using the Plan Assets invested in the Lincoln SVA and calculating the returns participants would have earned with the higher crediting rates used for the MassMutual Separate Account Stable Value and TIAA Traditional Annuity General Account RC, demonstrates forgone returns participants could have received:

**Table 3**

| Year | Plan Assets Invested in the Lincoln SVA | Average Annual Crediting Rates for Lincoln SVA in the Plan (%) | Return on Plan Assets in SVA  Plan Assets in SVA * crediting rate average for year | Average Annual Crediting Rates for MassMutual Separate Account Stable Value (%) | Return on Plan Assets in SVA  Plan Assets in SVA * crediting rate average for year | Average Annual Crediting Rates for TIAA Traditional Annuity (%) General Account RC | Return on Plan Assets in SVA  Plan Assets in SVA * crediting rate average for year |
|---|---|---|---|---|---|---|---|
| 2019 | $150,667,434 | 1.65 | $248,601,266 | 4.52 | $681,393,470 | 4.00 | $602,669,736 |
| 2020 | $200,136,288 | 1.30 | $260,177,174 | 4.03 | $806,549,241 | 3.80 | $760,517,894 |
| 2021 | $208,938,275 | 1.30 | $271,619,758 | 4.03 | $842,021,248 | 3.80 | $793,965,445 |
| 2022 | $208,309,703 | 2.30 | $400,912,317 | 4.71 | $821,434,475 | 5.08 | $884,621,743 |
| 2023 | $178,774,984 | 3.38 | $603,365,571 | 5.46 | $975,217,538 | 6.50 | $1,162,037,396 |
| 2024 | $176,568,451 | 2.39 | $421,998,598 | 4.96 | $875,779,517 | 5.63 | $993,197,537 |

80.  This demonstrates participants lost out on approximately $300 to $500 million per year in possible returns had Defendants investigated and selected readily available alternative stable value funds.

81.  The Plan's substantial investment of at least $150 million in assets in the Lincoln SVA (including Lincoln SVA assets held within the YourPath portfolios)

during the Class Period provided Defendants with considerable leverage to bargain for higher crediting rates, lower administrative fees, and/or more favorable contractual terms for the benefit of Plan participants.

82. Because Lincoln offers varying crediting rates for its stable value products to different institutional clients, Defendants had a duty to conduct a rigorous negotiation process to secure a rate that was commensurate with the Plan's size.

83. By failing to prudently exercise their economic leverage and by treating the Plan's investment passively, Defendants violated their fiduciary duty of prudence. This failure to secure reasonable rates from Lincoln has resulted in demonstrable losses from foregone investment income when compared to what a prudent fiduciary would have obtained under similar circumstances.

84. As Table 3 above shows clearly, the crediting rate of the Lincoln SVA was, upon information and belief, lower than the crediting rates offered by the comparable MassMutal Separate Account Stable Value and TIAA Traditional General Account Annuity. These readily available alternatives would have exponentially increased the amounts to the Class Members over time, with compounding interest.

85. A prudent fiduciary knew or should have known that Lincoln or other providers of fixed annuities offer substantially identical, better-performing stable-

value investments. A prudent fiduciary could have accomplished the goal of obtaining better-performing stable-value investments simply by demanding higher crediting rates from Lincoln and/or by submitting requests for proposals to Lincoln and other providers of stable-value investments, as substantially higher rates were readily available.

86.    By selecting a general account fixed annuity with an underperforming crediting rate, Defendants failed to provide participants with an option that adequately protected their principal, exposing participants to unreasonable loss of value over time. Defendants failed to do due diligence on the risks of the general account fixed annuity, as it complied with the Imprudent Conduct Standards, exempting it from being a prohibited transaction.

87.    In addition, or in the alternative, a prudent fiduciary knew or should have known that MassMutual and TIAA (as shown above) and others offered general account and slightly less risky separate-account stable value funds that had substantially higher crediting rates than the Plan's general-account Stable Value Fund. In addition, Lincoln has an overall lower S&P financial strength rating of A+, while TIAA is rated AA+ and Mass Mutual is rated AA+. The existence of higher performing TIAA general account and MassMutual's higher-performing separate-account stable value fund also should have put a prudent fiduciary on notice that the Plan could obtain better-performing stable-value investments with less risk.

**B.    Defendants Imprudently Selected and Retained Historically Underperforming Investment Options**

88.    Given Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan's investments, numerous investment options substantially underperformed their benchmarks (as well as lower-cost alternative investments that were available to the Plan).

89.    Prudent fiduciaries of large defined contribution plans must regularly analyze each of their plan's actively managed investment options to determine whether such funds will outperform their benchmark index, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class or substitute it with another investment.

90.    Defendants, however, failed to undertake such an analysis when they selected and retained the underperforming actively managed funds discussed in detail below. Defendants provided these fund options without conducting a prudent analysis, despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

91.    Had such an analysis been conducted by Defendants, operating within the ordinary scope of their fiduciary duty of prudence, they would have determined that the actively managed funds discussed below underperformed their respective

33

benchmark indices over extended periods of time. Indeed, the funds discussed below have demonstrated persistently poor performance for many years compared to the benchmarks that are used as the appropriate yardsticks to evaluate these fund's investment results.

92.    Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

93.    **American Century Emerging Markets R6**. Among the Plan's perennial underperforming investment options is the American Century Emerging Markets R6, which, on information and belief, has an unreasonably high expense ratio of 0.91%, as compared to comparable funds such as American Funds New World F3, which has an expense ratio of 0.57%, and the DESIX, which has an expense ratio of 0.44%, and have performed far better than the American Century Emerging Markets fund (*see* table below). Such excessive fees alone make the American Century Emerging Markets R6 imprudent.

34

94.    The imprudence of maintaining the American Century Emerging Markets R6 is compounded by its poor performance relative to both its benchmark index (Morningstar EM TME NR USD), and fund category (Diversified Emerging Mkts) for the 1-, 3-, 5-, and 10-year periods ending on June 30, 2023. Likewise, its annual returns percentile ranking was below the 50th percentile in 2016, 2018, 2021, 2022, and 2023.

95.    Moreover, a Participant Fee Disclosure shows that as of June 30, 2023, American Century Emerging Markets R6 had underperformed its benchmark index over the preceding 1-, 5-, and 10-year periods. The poor performance of the American Century Emerging Markets R6 fund has continued through March 31, 2025, as shown in **Tables 4** and **5** below:

**Table 4**

| In Plan/ Low Fee Alternative | Fund and Benchmark | Net Expense Ratio | Average Annual Return (%) As of 03/31/2025 | | | |
|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | AEDMX **American Century Emerging Markets R6** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.92% | 6.79  Category 4.96  Index 6.88 | -0.20  Category 1.72  Index 1.56 | 5.77  Category 8.84  Index 8.58 | 3.46  Category 3.59  Index 4.18 |
| *Low Fee Alternative* | FNWFX **American Funds New World F3** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.57% | 3.32  Category 4.96  Index 6.88 | *3.31*  Category 1.72  Index 1.56 | *10.82*  Category 8.84  Index 8.58 | *6.36*  Category 3.59  Index 4.18 |

| | | | | | | |
|---|---|---|---|---|---|---|
| *Low Fee Alternative* | REEIX **RBC Emerging Markets Equity I** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.88% | 8.99 Category 4.96 Index 6.88 | 3.55 Category 1.72 Index 1.56 | 8.77 Category 8.84 Index 8.58 | 4.38 Category 3.59 Index 4.18 |
| *Low Fee Alternative* | PEIFX **PIMCO RAE Emerging Markets Instl** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.75% | 5.64 Category 4.96 Index 6.88 | 8.02 Category 1.72 Index 1.56 | 16.19 Category 8.84 Index 8.58 | N/A Category 3.59 Index 4.18 |
| *Low Fee Alternative* | DESIX **DFA Em Mkts Sustnby Cor 1 Instl** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.44% | 6.30 Category 4.96 Index 6.88 | 2.27 Category 1.72 Index 1.56 | 9.70 Category 8.84 Index 8.58 | N/A Category 3.59 Index 4.18 |
| *Low Fee Alternative* | FZAEX **Fidelity Advisor Focused Em Mkts Z** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.81% | 12.68 Category 4.96 Index 6.88 | 4.92 Category 1.72 Index 1.56 | 10.52 Category 8.84 Index 8.58 | 6.22 Category 3.59 Index 4.18 |

**Table 5**

| In Plan/ Low Fee Alternative | Fund and Benchmark | Net Expense Ratio | Average Annual Return (%) As of 06/30/2025 | | | |
|---|---|---|---|---|---|---|
| | | | **1Y** | **3Y** | **5Y** | **10Y** |
| **IN PLAN** | AEDMX **American Century Emerging Markets R6** **Category:** Diversified Emerging Mkts | 0.92% | 15.04 Category 13.34 Index | 8.87 Category 10.41 Index | 4.27 Category 7.21 Index | 4.41 Category 4.74 Index |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Benchmark Index:** Morningstar EM TME NR USD | | 13.96 | 9.75 | 7.30 | 5.29 |
| *Low Fee Alternative* | RNWGX **American Funds New World R6** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.57% | 15.53 Category 13.34 Index 13.96 | 13.74 Category 10.41 Index 9.75 | 8.82 Category 7.21 Index 7.30 | 7.83 Category 4.74 Index 5.29 |
| *Low Fee Alternative* | REEIX **RBC Emerging Markets Equity I** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.88% | 14.24 Category 13.34 Index 13.96 | 11.44 Category 10.41 Index 9.75 | 7.77 Category 7.21 Index 7.30 | 5.53 Category 4.74 Index 5.29 |
| *Low Fee Alternative* | PEIFX **PIMCO RAE Emerging Markets Instl** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.75% | 10.49 Category 13.34 Index 13.96 | 16.97 Category 10.41 Index 9.75 | 14.93 Category 7.21 Index 7.30 | 7.43 Category 4.74 Index 5.29 |
| *Low Fee Alternative* | DESIX **DFA Em Mkts Sustnby Cor 1 Instl** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.44% | 15.41 Category 13.34 Index 13.96 | 10.91 Category 10.41 Index 9.75 | 8.46 Category 7.21 Index 7.30 | N/A Category 4.74 Index 5.29 |
| *Low Fee Alternative* | FZAEX **Fidelity Advisor Focused Em Mkts Z** **Category:** Diversified Emerging Mkts **Benchmark Index:** Morningstar EM TME NR USD | 0.81% | 15.09 Category 13.34 Index 13.96 | 11.10 Category 10.41 Index 9.75 | 7.98 Category 7.21 Index 7.30 | 7.30 Category 4.74 Index 5.29 |

96.     Given this prolonged period of excessive costs and underperformance, it was imprudent for Defendants to maintain this fund in the Plan during the Class Period.

97.     **PIMCO All Asset Instl.** The PIMCO All Asset Instl is another underperforming investment option offered by the Plan. The PIMCO All Asset Instl has an unreasonably high expense ratio of 0.87%, as compared to better performing comparable funds such as Columbia Thermostat Inst3 and AQR Multi-Asset R6. Besides its relatively high cost, its annual returns percentile ranking was below the 50th percentile in 2015, 2019, 2023, and 2024.

98.     The imprudence of maintaining the PIMCO All Asset Instl is demonstrated by its poor performance relative to its benchmark index (Morningstar Mod Agg Tgt Risk TR USD), as well as tactical allocation funds that were readily available to the Plan throughout the Class Period, like the comparator funds in the table below.

99.     Moreover, a Participant Fee Disclosure shows that as of June 30, 2023, PIMCO All Asset Instl had underperformed its benchmark index over the preceding 1-, 5-, and 10-year periods. The poor performance of the PIMCO All Asset Instl fund has continued through March 31, 2025, as shown in **Tables 6 and 7** below:

38

**Table 6**

| In Plan/ Low Fee Alternative | Fund and Benchmark | Net Expense Ratio | Average Annual Return (%) As of 03/31/2025 | | | |
|---|---|---|---|---|---|---|
| | | | **1Y** | **3Y** | **5Y** | **10Y** |
| **IN PLAN** | PAAIX **PIMCO All Asset Instl** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.87% | 5.60 <br><br> Category 2.19 <br><br> Index 5.95 | 1.85 <br><br> Category 2.67 <br><br> Index 3.87 | 9.06 <br><br> Category 7.99 <br><br> Index 8.80 | 4.99 <br><br> Category 4.33 <br><br> Index 6.09 |
| *Low Fee Alternative* | FLMAX **Meeder Muirfield Adviser** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.91%[9] | 1.95 <br><br> Category 2.19 <br><br> Index 5.95 | 6.43 <br><br> Category 2.67 <br><br> Index 3.87 | 12.12 <br><br> Category 7.99 <br><br> Index 8.80 | 6.64 <br><br> Category 4.33 <br><br> Index 6.09 |
| *Low Fee Alternative* | CYYYX **Columbia Thermostat Inst3** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.50% | 8.26 <br><br> Category 2.19 <br><br> Index 5.95 | 3.94 <br><br> Category 2.67 <br><br> Index 3.87 | 7.52 <br><br> Category 7.99 <br><br> Index 8.80 | 6.32 <br><br> Category 4.33 <br><br> Index 6.09 |
| *Low Fee Alternative* | AQRRX **AQR Multi-Asset R6** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.71% | 7.27 <br><br> Category 2.19 <br><br> Index 5.95 | 5.42 <br><br> Category 2.67 <br><br> Index 3.87 | 8.92 <br><br> Category 7.99 <br><br> Index 8.80 | 5.65 <br><br> Category 4.33 <br><br> Index 6.09 |

---

[9] Plaintiffs are cognizant that the expense ratio of Meeder Muirfield Adviser fund is slightly higher than the in-Plan PIMCO All Asset Instl fund, however, the Meeder Muirfield Adviser fund has performed substantially better than the in-Plan fund over 3-, 5-, and 10-years.

**Table 7**

| In Plan/ Low Fee Alternative | Fund and Benchmark | Net Expense Ratio | Average Annual Return (%) As of 066/30/2025 | | | |
|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | PAAIX **PIMCO All Asset Instl** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.87% | 9.00 Category 6.48 Index 12.92 | 6.71 Category 7.92 Index 10.53 | 7.25 Category 7.02 Index 7.64 | 5.35 Category 4.93 Index 6.82 |
| *Low Fee Alternative* | FLMAX **Meeder Muirfield Adviser** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.91%[10] | 7.72 Category 6.48 Index 12.92 | 12.54 Category 7.92 Index 10.53 | 12.20 Category 7.02 Index 7.64 | 7.57 Category 4.93 Index 6.82 |
| *Low Fee Alternative* | CYYYX **Columbia Thermostat Inst3** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.50% | 14.14 Category 6.48 Index 12.92 | 9.30 Category 7.92 Index 10.53 | 6.54 Category 7.02 Index 7.64 | 7.20 Category 4.93 Index 6.82 |
| *Low Fee Alternative* | AQRRX **AQR Multi-Asset R6** **Category:** Tactical Allocation **Benchmark Index:** Morningstar Mod Tgt Risk TR USD | 0.71% | 10.52 Category 6.48 Index 12.92 | 10.43 Category 7.92 Index 10.53 | 8.88 Category 7.02 Index 7.64 | 6.42 Category 4.93 Index 6.82 |

100. Given the high cost and prolonged underperformance, it was imprudent for Defendants to retain the PIMCO All Asset Instl as an investment option in the Plan.

---

[10] Plaintiffs are cognizant that the expense ratio of Meeder Muirfield Adviser fund is slightly higher than the in-Plan PIMCO All Asset Instl fund, however, the Meeder Muirfield Adviser fund has performed substantially better than the in-Plan fund over 3-, 5-, and 10-years.

**C.**    **Defendants Failed to Monitor Excessive Compensation Paid to Lincoln for Recordkeeping and Administrative Fees**

101.    Defendants have a duty to prudently select and monitor compensation paid to covered service providers. Courts that have considered the issue have made it clear that a fiduciary must ensure that "no more than reasonable compensation is paid" for a party in interest's services, and that a fiduciary must "consider the compensation received by the party 'from all sources in connection with the services it provides to a covered plan pursuant to' the contract, not just the compensation the party receives directly from a plan." *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (quoting 29 C.F.R. § 2550.408b-2(a)(3)).

102.    Here, that means the Defendants "needed to consider the compensation" that Lincoln received from all sources "when determining whether 'no more than reasonable compensation' was paid for [Lincoln's] services." *Bugielski,* 76 F.4th at 912 (9th Cir. 2023) (quoting 29 C.F.R. § 2550.408b-2(a)(3)).

103.    The U.S. Department of Labor guidance has also emphasized the importance of prudently selecting service providers. The DOL has observed that:

> [T]he responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided. In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….
>
> Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the

41

decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be able to demonstrate compliance with ERISA's fiduciary standards.

104. Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price. Because recordkeeping is, functionally, a generic service, the selection of a provider by a prudent fiduciary must be heavily weighted toward obtaining the lowest reasonable price rather than on any purported differentiation in the quality of service.

105. The cost of recordkeeping services typically depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in their retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

42

106.    When selecting a recordkeeper, a fiduciary of a large plan like the Plan at issue must solicit competitive bid proposals from several recordkeepers to obtain the best possible price. The plan fiduciary should require the recordkeeper to identify not only the recordkeeping services and their cost, but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plan must select.

107.    To monitor recordkeeping costs, it is customary that a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper selected charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, or revenue share from mutual funds, among other sources.

108.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of

43

approximately three years and monitor recordkeeping costs regularly within that period.

109. In this case, based on information currently available to Plaintiffs regarding the Plan's features and the nature of the administrative services provided by Lincoln, the Plan's active participant level was between 5,365 and 8,700 during the Class Period. Based on the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan should have been no more than $35 per participant per year for the Class Period.

110. Here, however, Defendants allowed Lincoln to receive windfall compensation for providing administrative services that was far greater than reasonable rate of $35 per participant per year. Varying from $47 to $95 as reported on the Plan's forms 5500.

111. This compensation is comprised of (1) a recordkeeping fee, (2) a revenue sharing arrangement whereby Lincoln paid itself based on all Plan assets invested in Lincoln SVA, (3) "spread" income representing the difference between the crediting rate that Lincoln pays to Plan participants and the returns that are earned by Lincoln Financial and/or Lincoln National by investing their general account funds; and (4) indirect compensation known as "float" income Lincoln Financial received from Plan participants' deposits and withdrawals of money that passed through the Lincoln's clearing account. Lincoln received this excessive

44

compensation as a result of Defendants' failure to monitor and control Lincoln's compensation from all sources.

112.    Participant Disclosure Notices issued during the Class Period reported that Plan participants would be charged $9 per quarter for administrative services, including recordkeeping. However, the amount of compensation that Lincoln actually received for providing such services to the Plan averaged $58.21 per participant per year. Indeed, as shown in **Table 8** below, the fee income that Lincoln received from the Plan was, by any measure, unreasonable and excessive:

**Table 8**

| YEAR | Active Plan Participants at Year End | Total Plan Assets at Year End | Lincoln Retirement Services Company, LLC - Plan Expense (%) Total Assets | Administration Fee (see Participant Fee Disclosure) | YourPath® Portfolios investment management fee (%) | Plan Expense Fee | Direct Fees to Lincoln Retirement Reported in 5500 | Total Admin Fees Paid to Lincoln (Party-in-Interest) | Admin Fees Per Participant Per Year |
|---|---|---|---|---|---|---|---|---|---|
| 2019 | 6,583 | $619,742,577.00 | 0.025 | | – | $ 154,935.64 | $ 279,458.00 | $ 309,653.00 | $ 47.04 |
| 2020 | 7,167 | $786,189,722.00 | 0.025 | | – | $ 196,547.43 | $ 251,216.00 | $ 303,683.00 | $ 42.37 |
| 2021 | 5,365 | $886,013,526.00 | 0.025 | | – | $ 221,503.38 | $ 421,447.00 | $ 510,919.00 | $ 95.23 |
| 2022 | 8,262 | $794,441,178.00 | 0.025 | | 0.075 | $ 198,610.29 | $ 334,775.00 | $ 393,134.00 | $ 47.58 |
| 2023 | 6,487 | $930,511,014.00 | 0.025 | $9.00 / quarterly | 0.075 | $ 232,627.75 | $ 322,848.00 | $ 381,500.00 | $ 58.81 |
| Avg. | | | | | | | | | $ 58.21 |

113.    In addition to direct compensation paid to Lincoln for recordkeeping services to the Plan, the Plan's annual Form 5500 filings indicate that Lincoln received indirect compensation from revenue sharing arrangements with certain funds offered by the Plan, as well as substantial spread income on the Lincoln SVA. Plaintiffs estimate that the spread income that Lincoln received from the Lincoln SVA ranged from an estimated low of $1,506,674 in 2019 to a high of $2,089,382.75

45

in 2021. In violation of the Impartial Conduct Standards, Defendants failed to consider the additional compensation that Lincoln received from spread income on the Lincoln SVA in determining whether the total compensation that Lincoln received was reasonable, and indeed, it was not.

114. When the administrative fees in the table above are combined with the revenue sharing payments that Lincoln received from the Lincoln SVA and other investment options, the total compensation that Lincoln received – not including the substantial spread income earned by depositing these Plan assets in Lincoln's general account – is truly staggering.

115. Additionally, Defendants agreed that any time that Plan participants deposit or withdraw money from their individual accounts, the funds will first pass through the Lincoln's clearing account. Defendants also agreed that the Lincoln could, as part of its compensation for service provided to the Plan, keep all interest or investment returns earned on Plan participant money while the money is in Lincoln's clearing account. This is yet another form of indirect compensation that the Lincoln received as the recordkeeper for the Plan pursuant to its arrangement with Defendants.

116. There is nothing *per se* imprudent about this arrangement. The DOL has expressly approved this type of arrangement but requires fiduciaries like Defendants to negotiate, monitor, and factor into a recordkeeper's compensation the

46

earnings that a recordkeeper makes on the float. *See* U.S. Department of Labor Field Assistance Bulletin No. 2002-03, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on September 4, 2025.

117.   Here, Defendants failed to negotiate, monitor, or factor into the Lincoln's compensation the earnings that the Lincoln receive via float. In fact, Lincoln's earnings on float alone were likely sufficient to cover a substantial portion of the reasonable administrative expenses for services provided to the Plan.

118.   Defendants should have been aware of this potential for abuse and monitored for it. They failed to do that and the Class Members suffered because of it. Every dollar of unreasonable recordkeeping fees cost participants a retirement dollar that was no longer available for investment, including further growth and compounding.

**D.     The Committee Breached its Duty of Loyalty by not Acting in the Sole Interest of Plan's Participants and by Failing to Pursue Financial Benefit for the Plan's Participants**

119.   Under ERISA's duty of loyalty, a plan fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of benefitting them. *See* 29 U.S.C. § 1104(a)(1)(A)(i). This sole interest rule is a codification of what is found in the common law of trusts. It creates a very specific and narrow path for an ERISA plan manager when

considering an investment strategy or providing mutual fund selections for self-directed individual accounts. ERISA fiduciaries have a duty to the beneficiaries and participants not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the ERISA plan—they must act with an "eye single" to the interests of the plan participants. Restatement (Third) of Trusts § 78(1) cmt. F. (Am. Law Inst. 2007).

120. Perhaps the most fundamental duty of a [fiduciary] is that he must display … complete loyalty to the interest of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons. An ERISA plan manager who is influenced by his own or a third party's interests is disloyal because the ERISA plan manager is no longer acting solely in the interests of the beneficiaries. Here, the Committee consistently selected and kept underperforming funds that carried high manager fees for inexplicable reasons. The Committee's actions were not in the sole interest of plan participants and beneficiaries and thereby violate the duty of loyalty.

121. When the Committee acts to benefit anyone else outside of the Plan's participants it is breaching their duty of loyalty.

122. Similarly, the Committee failed and ignored its duty to pursue financial benefits for the Plan's participants.

48

123. Based on the U.S. Supreme Court's interpretation of the statutory language, "providing benefits to participants and their beneficiaries," a fiduciary's duty of loyalty also requires an exclusive focus on the pursuit of financial benefits:

> "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." Read in the context of ERISA as a whole, the term "benefits" in the provision just quoted must be understood to refer to the sort of *financial* benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries.

*Fifth Third Bancorp v. Dudenhoeffer,* 573 U.S. 409, 420-21 (2014) (quoting 29 U.S.C. § 1104(a)(1)(A)(i)-(ii)). "The term ['benefits'] does not cover nonpecuniary benefits." *Id.* at 421. Therefore, ERISA's duty of loyalty mandates the pursuit of financial benefits for the plan participants and beneficiaries and does not allow for the pursuit of nonfinancial or nonmonetary benefits, even if plan participants and beneficiaries approve.

124. This means that even if ERISA plan documents state that other objectives could or must be pursued, such as cleaning up the environment, raising labor wages, excluding investments that involve alcohol, guns, or tobacco, etc., making the workplace safer, providing better medical benefits for employees, or solving the world's social or political problems, no matter how worthy the objective, this conflicts with ERISA's fiduciary duties and is void as a matter of public policy. *See Fifth Third Bancorp*, 573 U.S. at 421 ("With irrelevant exceptions, 'any provision in an agreement or instrument which purports to relieve a fiduciary from

49

responsibility … for any … duty under this part shall be void as against public policy'" (citing 29 U.S.C. § 1110(a)).

125. To comply with its fiduciary duties, an ERISA plan manager must have the sole focus of pursuing the highest risk-adjusted financial return possible for plan participants and beneficiaries. If this does not occur because the Committee selected funds and managers with excessive fees and poor performance, the Committee breaches its fiduciary duty of loyalty.

126. Here, the Committee consistently selected and kept options with excessive fees and poor risk adjusted return.

## CLASS ACTION ALLEGATIONS

127. ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

128. Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs bring this case as a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs will seek to certify the following

class, and to be appointed as the representatives ("Named Plaintiffs") on behalf of the following class:

> All current and former participants in or beneficiaries of the Valley Hospital Health System Partnership Plan (the "Plan") from September 4, 2019 through the date of judgment in this matter, except Defendants (the "Class").

129.  This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

  a.  The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 2024, the Plan had 8,700 active participants.

  b.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the many questions of law and fact common to the Class include, without limitation:

  - whether the Defendants are fiduciaries of the Plan;

  - whether the Defendants breached their fiduciary duty of prudence with respect to the Plan;

  - whether the Defendants had a duty to monitor other fiduciaries of the Plan;

- whether the Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plan; and

- the extent of damage sustained by Class Members and the appropriate measure of damages.

130.   Plaintiffs' claims are typical of those of the Class Members because their claims arise from the same event, practice, and/or course of conduct as other members of the Class.

131.   Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general.

132.   Plaintiffs have no interests that conflict with those of the Class.

133.   Defendants do not have any unique defenses against the Plaintiffs that would interfere with their representation of the Class.

134.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Breach of Fiduciary Duties
### Against Defendants

135.   Plaintiffs incorporate each allegation above as if fully set forth herein.

136.   Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). They were obligated to discharge their duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

137.   Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

138.   As described above, Defendants failed to act prudently and in the best interest of the Plan and participants and breached their fiduciary duties in various ways. Specifically, among other failings, Defendants (i) failed to prudently select and monitor the Plan's stable value; (ii) failed to investigate the availability of lower-cost funds; (iii) failed to prudently monitor and replace underperforming funds;

fund; and (iv) failed to prudently investigate and monitor compensation Lincoln received for recordkeeping and administrative service.

139.    Defendants knowingly participated in each fiduciary breach of the other Plan's fiduciaries, knowing that such acts were a breach, and enabled the other Plan's fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the Plan's fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each of the Defendants is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

140.    Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date.

141.    As a direct and proximate result of these breaches, the Plan, Plaintiffs, and Class Members suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced and are entitled to be made whole for their losses.

54

## COUNT II
### Breach of Fiduciary Duty to Monitor Excessive Fees
### Against Defendants

142.   Plaintiffs incorporate each allegation above as if fully set forth herein.

143.   Defendants were obligated to discharge their fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). In investing and managing the Plan's assets, Defendants were permitted to incur only appropriate and reasonable costs.

144.   Defendants failed to defray the Plan's recordkeeping and administrative expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's recordkeeping expenses were excessive, resulting in losses to the Plan's participants.

145.   Defendants also knowingly participated in the breach of the duties of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of each of its co-fiduciaries under 29 U.S.C. § 1105(a).

55

146.   Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

**COUNT III**
**Prohibited Transaction**
**Against Defendants**

147.   Plaintiffs incorporate each allegation above as if fully set forth herein.

148.   Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

149.   Defendants Valley Hospital, the Board, and the Committee were fiduciaries to the Plan.

150.   Together, Defendants caused the Plan to engage in the annuity transactions with knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Lincoln.

151.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Lincoln and the Plan.

152.    When Defendants caused the Plan to engage in the annuity transactions, Lincoln was a party in interest, including because Lincoln was person providing services to the Plan and holding and managing Plan assets. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transactions at issue.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of the Plan and proposed Class Members, respectfully request that the Court:

a)    Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appoint Plaintiffs as the Class Representatives;

b)    Find and declare that the Defendants breached their fiduciary duties as described above;

c)    Find and adjudge that the Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties alleged herein, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty as alleged herein;

57

d)      Determine the method by which the Plan's losses under 29 U.S.C.

§1109(a) should be calculated;

e)      Order the Defendants to provide an accounting necessary to determine

the amounts that the Defendants must make good to the Plan under §1109(a);

f)      Surcharge against the Defendants and in favor of the Plan all amounts

involved in any transactions which an accounting reveals were improper, excessive,

and/or in violation of ERISA;

g)      Award to Plaintiffs and the Class their attorneys' fees and costs under

29 U.S.C. §1132(g)(1) and the common fund doctrine;

h)      Order the payment of prejudgment and post-judgment interest to the

extent allowed by law; and

i)      Grant other equitable or remedial relief as the Court deems appropriate.


Date: December 18, 2025            /s/ Alexandra K. Piazza
                                   Alexandra K. Piazza
                                   (NJ Bar No. 01092-2013)
                                   **BERGER MONTAGUE PC**
                                   8241 La Mesa Blvd., Suite A
                                   La Mesa, CA 91942
                                   Tel.: (215) 875-3063
                                   Fax: (215) 875-4620
                                   apiazza@bergermontague.com

                                   Shanon J. Carson (*pro hac vice*)
                                   Natalie Lesser
                                   (NJ Bar No. 017882010)
                                   Olivia S. Lanctot
                                   (NJ Bar No. 415612023)


58

**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
scarson@bergermontague.com
nlesser@bergermontague.com
olanctot@bergermontague.com

Eric Lechtzin
(NJ Bar No. 011841992)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Tel.: (215) 867-2399
elechtzin@edelson-law.com


*Attorneys for Plaintiffs*
*and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record through the Court's ECF system on this 18th day of December, 2025.

By: _/s/    Alexandra K. Piazza_
Alexandra K. Piazza